**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN SANTORO, | ) |
|       Plaintiff, | ) ) ) |
| v. | ) No. 09 C 2297 |
| MICHAEL ASTRUE,<br>Commissioner of Social Security, | ) ) Magistrate Judge Sheila Finnegan ) |
|       Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Santoro seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff moved for summary judgment. On April 26, 2010, the case was reassigned to this Court for all further proceedings. For reasons stated below, the Court now grants Plaintiff's motion.

## PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits on April 7, 2006, alleging that he became disabled on March 30, 2005 from an array of ills, principally discogenic and degenerative back disorders. (R. 56, 62). The Social Security Administration ("SSA") denied the claim initially on September 5, 2006, and again on reconsideration on December 29, 2006. (R. 62-66, 70-73). Plaintiff filed a timely request for a hearing, which an Administrative Law Judge ("ALJ") held on May 6, 2008. On September 3, 2008, the ALJ

issued an opinion finding that Plaintiff's impairments do not prevent him from performing light jobs that exist in sufficient number in the national economy. (R. 13-22). The Appeals Council declined Plaintiff's request for review on February 2, 2009. (R. 1-3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## STATEMENT OF FACTS

### A. Plaintiff's Medical History

Plaintiff was born on October 28, 1958 and was nearly 50 years old at the time of the ALJ's decision. (R. 20). He is a high school graduate and spent most of his working life as a union carpenter setting up and dismantling trade show exhibits at McCormick Place. (R. 21, 135-36, 138). He also worked from 1995 to 1997 running small offset printing presses. (R. 135, 137). Plaintiff's work as a carpenter regularly required him to lift weights of 50 to 100 pounds. (R. 362).

In March 1993, Plaintiff suffered a work-related injury to his lower back, resulting in pain radiating down both legs. (R. 458). A July 1, 1993 MRI showed mild left foraminal narrowing at L5-S1, with mild spinal stenosis and a mild central protrusion of the L4-L5 intervertebral disc. (R. 458). Plaintiff's back pain and stiffness did not improve, prompting him to see Dr. James B. Boscardin, a board-certified orthopaedic surgeon, on April 29, 1994. After noting that a myelogram showed a central herniation, Dr. Boscardin found Plaintiff to have a positive bilateral straight leg raising test, and indicated that he might benefit from surgical intervention. (R. 475). A few months later, on August 23, 1994, Plaintiff had surgery to repair the damaged discs and to relieve lower back and leg pain. (R. 480). By February 1, 1995, Plaintiff's neurological exam was "totally within normal

2

limits," and on March 20, 1995, Dr. Boscardin released him to return to work with a restriction that he lift no more than 40 pounds. (R. 463-64).

Plaintiff underwent a series of additional operations in the following years, including hernia repairs in 2000 and 2002, and two arthroscopic surgeries on his left shoulder in 2001. (R. 193-94, 232-33, 242-43, 502, 511). In January 2002, Dr. Boscardin released Plaintiff to return to work with a restriction that he lift no more than 30 pounds overhead. (R. 496-97).

More than two and a half years later, in September 2004, Plaintiff's lower back troubles returned. A September 8, 2004 MRI showed "[l]arge right and smaller left protrusions of the L5-S1 disc with severe right and moderately severe left foraminal stenosis." (R. 491). Dr. Boscardin diagnosed a new disc herniation at L5-S1 and prescribed Decadron and a Medrol Dosepak for pain. (R. 486). When Plaintiff saw Dr. Boscardin again on September 22, 2004, he exhibited "severe L5-S1 radiculopathy, on the right," "a markedly positive straight leg raising test," "decreased sensation and a markedly positive tension sign," "[d]ecreased to absent Achilles reflex on the right . . . and [d]ecreased sensation over the S1 dermatome." (R. 208-09, 485). The next day, Dr. Boscardin performed a second surgery described as a "micro laminectomy, partial diskectomy L5-S1 on the right." (R. 213-14, 489). During the surgery, Plaintiff exhibited symptoms consistent with a heart attack, and the following week, he received a coronary stent. (R. 351-52). Dr. Boscardin's treatment notes reflect that Plaintiff had experienced coronary symptoms prior to the surgery, but that he had failed to notify Dr. Boscardin because his leg pain was so severe that he did not want to risk delaying his surgery. (R. 286, 483-84).

3

Plaintiff experienced total relief from his symptoms after the surgery, and in November 2004, he resumed work with a lifting restriction of 10 to 15 pounds. (R. 278, 568). Shortly thereafter, in February 2005, however, he suffered another injury and the lower back and right leg pain returned. A May 24, 2005 MRI showed "recurrent right disc protrusion at the L5-S1 level with resulting spinal stenosis," "[l]eft foraminal stenosis at the L5-S1 level," and "mild central spinal stenosis at the L4-L5 level." (R. 554, 568). Through early June 2005, Plaintiff continued to exhibit symptoms of lumbar radiculopathy, including radiating pain "from the back down through the buttock down to [the] heel," markedly positive right tension sign, muscle weakness, difficulty walking, and decreased right side sensation. (R. 175, 177, 278-79). Dr. Boscardin noted that the May 2005 MRI revealed "a significant herniation at L5, S1 on the right," and scheduled a microlaminectomy to repair this new damage. During that third operation on June 16, 2005, however, Plaintiff suffered a nearly fatal anaphylactic reaction, and Dr. Boscardin abruptly terminated the surgery before performing any repairs. (R. 180-83, 265, 287, 317-18).

On June 28, 2005, Dr. Boscardin completed Plaintiff's microlaminectomy in a fourth surgical procedure. (R. 178-79, 270-71). Once again, Plaintiff experienced greatly reduced pain and neurological signs following this treatment. (R. 171-73). At follow-up visits with Dr. Boscardin through October 24, 2005, Plaintiff continued to exhibit "low-grade radicular-type symptoms in his leg on and off with activities," but he did not have "that terrible pain that he had prior to surgery." (R. 170, 172). In December 2005, Plaintiff returned to Dr. Boscardin complaining of pain going to the right and left legs. Dr. Boscardin observed that Plaintiff was "in no acute neuro crisis other than the fact he has a markedly positive tension

4

sign." He prescribed a host of medications for the pain, including Decadron, a Medrol Dosepak, Indocin, Lyrica and Norco. (R. 169).

A couple of months later, on February 15, 2006, Plaintiff showed marked improvement in his symptoms. Dr. Boscardin found him to be neurologically intact with only occasional back pain, and advised him to "get into a good exercise program," with a goal of walking two to three miles a day. (R. 168). By May 19, 2006, however, Plaintiff's low back problems reappeared, along with achiness in his hip. Dr. Boscardin indicated that the symptoms were likely "discogenic in nature due to the fact that these discs are significantly worn." He started Plaintiff on Vicodin Extra Strength and instructed him to continue taking Lyrica at bedtime. (R. 167). A May 23, 2006 MRI showed degenerative changes at L4-L5 and L5-S1, and central disc protrusion with moderate left and mild right neural foraminal narrowing at L4-L5. The test showed no other evidence of disc herniation, extrusion or protrusion. (R. 188). Dr. Boscardin confirmed these radiological findings during a June 16, 2006 examination, and admonished Plaintiff to take his Lyrica medication on a regular basis. The doctor refilled Plaintiff's Indocin and noted, "I feel [Plaintiff] needs no further surgery on his back at this time, but we need to deal with his chronic nerve irritation." (R. 410).

In August 2006, Plaintiff lost consciousness and fell while walking to the bathroom at night, resulting in multiple broken teeth and facial bones. (R. 381-82, 416-25). The cause of Plaintiff's fainting was never definitively determined, although Plaintiff admits to having consumed four beers on an empty stomach before going to bed, and the hospital measured his blood alcohol level at 0.075%. (R. 422).

Plaintiff saw Dr. Boscardin again on November 17, 2006, and continued to complain of back pain and stiffness. He did not exhibit any radicular symptoms, and the doctor described his "immediate orthopedic problem" as involving the left elbow. (R. 409, 565). When Plaintiff returned to Dr. Boscardin more than a year later on February 21, 2008, he was "in no neurological crisis" but was "getting some cramps" and "simply trying to get by as best [h]e can." (R. 564). At Plaintiff's last visit on April 10, 2008, Dr. Boscardin noted symptoms "compatible with chronic radiculopathy," including pain radiating from his back down his legs, depressed reflexes, and positive straight-leg raising both while lying and sitting. Dr. Boscardin opined that Plaintiff "clearly sounds like he is getting a central issue," but noted that he lacked insurance and was unable or unwilling to get another MRI to confirm that diagnosis. Given Plaintiff's past near-fatal allergic reaction, Dr. Boscardin concluded that he was a poor candidate for further surgery. Under these circumstances, Dr. Boscardin stated that Plaintiff's recurrent back symptoms and radiculopathy "are real" and rendered him incapable of gainful employment. (R. 562).[1]

**B.      Medical Evidence Gathered in Response to Plaintiff's Application for Disability**

After Plaintiff filed his application for disability benefits in April 2006, the Bureau of Disability Determination Services ("DDS") sent him for an "Internal Medicine Consultative Examination" with Dr. Mahesh Shah on August 15, 2006. (R. 362-65). Dr. Shah described Plaintiff as being in no acute distress, but noted that he "walks slowly with some discomfort

---

[1] On October 21, 2008, Dr. Boscardin submitted a letter to the Appeals Council explaining why Plaintiff was unable to perform even sedentary work. Dr. Boscardin discussed Plaintiff's lengthy treatment history, and set forth a detailed analysis supporting his conclusion that Plaintiff's lumbar disc disease precludes him from lifting even light weight, walking for any distance, or sitting for extended periods. (R. 567-69). As Defendant correctly notes, however, the letter from Dr. Boscardin was not before the ALJ when he issued his opinion on September 3, 2008.

6

in his back[, though] he does not use any assisting devices." (R. 363). Plaintiff "could not sit for an extended period of time . . . , had difficulty lying down . . . , [and] had much discomfort in his lower back, which is affecting his movements." (*Id.*) Dr. Shah found "marked tenderness in [Plaintiff's] lumbar region with mild paraspinal muscle spasms," as well as positive straight leg raising signs on both sides. (R. 364). There was no evidence of muscle-wasting, paralysis, or involuntary movements, however, and the tendon reflexes were normal. (R. 365). Dr. Shah's clinical impression was "severe low back pain with marked limitation of range of motion." (R. 365).

Because Plaintiff had had an MRI of his lower back late the previous year, Dr. Shah did not recommend another. The SSA arranged instead for an x-ray of Plaintiff's injured shoulder, which showed "[i]rregularity of the under-surface of the clavicle of undetermined clinical significance." (R. 360).

Later the same month, on August 29, 2006, Dr. Frank Jimenez completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. He noted Plaintiff's history of disc herniation, and found his gait to be "antalgic but unassisted." (R. 373). Dr. Jimenez acknowledged Plaintiff's positive straight leg raise sign bilaterally, but found his leg strength and sensation to be normal. (*Id.*) Based on his review, Dr. Jimenez concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and push and pull without limitation. (R. 367). Plaintiff had "occasional postural limitations due to disc herniation L5-S1 and left shoulder pain," but he could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 368). In addition, Plaintiff was limited to only occasional

7

overhead reaching with the left arm "due to symptoms of pain." (R. 369-70). On December 28, 2006, Dr. Charles Kenney approved Dr. Jimenez's findings as written. (R. 441-42).

**C.     The May 6, 2008 Hearing**

At the May 6, 2008 hearing before the ALJ, Plaintiff testified that he suffered from "[c]onstant lower back pain" and spent much of the day getting up and down from his recliner at home, watching television. (R. 32, 38-39). He continued to see Dr. Boscardin every six months to a year, but stated that there was "not too much more that [the doctor] says he can really do" aside from prescribing pain medication. (R. 35-36). Plaintiff testified that he was capable of light grocery shopping, vacuuming with a Dustbuster, and washing dishes, as well as lifting a gallon of milk. (R. 40, 42). On some days, he could dress himself, but on other days he needed assistance from his wife. (R. 40).

Plaintiff estimated that he could walk for 10 to 15 minutes at a time, for no more than one hour total each day. He could also stand in 10-minute increments for about an hour and a half throughout the course of an 8-hour workday, and sit for 20 minutes at a time. (R. 42-43). By Plaintiff's estimate, he spent at least six to eight hours in the recliner each day. (R. 49). Plaintiff described being in constant pain that felt "like a bad toothache" from his lower back to his feet, and complained of daily pain at a level of "six or seven" on a ten-point scale. (R. 41, 48). He also suffered from cramping in his legs that woke him up at night. (R. 41, 45). Plaintiff testified that his memory had been impaired since his third back surgery, and he reported difficulty walking normally and an inability to raise his left arm above shoulder height. (R. 47, 49).

A vocational expert testified that Plaintiff was no longer able to work as a carpenter making trade-show displays or operating a printing press. (R. 51). He opined that a worker

with Plaintiff's education, work experience, and age, and an ability to engage in light work with only occasional climbing, balancing, stooping, kneeling, crouching, crawling, and reaching overhead with the left arm, could perform at least a half a million jobs in the Chicago area. (R. 52-54). He also testified that a person who needed to lie down frequently and could only stand for one and a half hours, walk for one hour, and sit for three hours at a time would not be capable of performing any of these jobs, since he could not work for an eight-hour day, and the walking and standing would take him off task more than ten percent of the workday. (R. 54).

**D.     The Determination by the ALJ**

The ALJ found Plaintiff not to be disabled from March 20, 2005, the date of alleged onset, through September 3, 2008, the date of the ALJ's decision. (R. 22). In applying the five-step analysis required by 20 C.F.R. § 404.1520(a), the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 20, 2005. (R. 15). He next found that Plaintiff's "degenerative disc disease of the lumbar spine and status-post left rotator cuff and labrum tear" constituted severe impairments, but that they did not, alone or in combination, meet or medically equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15-16).

Based on Plaintiff's testimony and the medical evidence of record, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to do light work with only occasional climbing, balancing, stooping, kneeling, crouching, crawling, and overhead reaching with his left arm. (R. 16-20). In reaching this conclusion, the ALJ stated that Plaintiff experienced significant improvement following his last lumbar surgery in June 2005, and noted that despite lumbar tenderness, spasm and decreased range of motion,

there was no evidence of muscle atrophy or significant motor strength weakness. (R. 17). The ALJ acknowledged Dr. Boscardin's April 10, 2008 opinion that Plaintiff was completely unable to work, but noted that the "determination of disability is reserved for the Commissioner." (R. 19). The ALJ also observed that Dr. Boscardin "described no specific work-related limitations" to support his evaluation, which the ALJ found to be "conclusory and inconsistent with other significant evidence of record." (*Id.*).

In discounting Dr. Boscardin's opinion, the ALJ explained that the evidence was more consistent with the opinion of Dr. Shah, who performed the most "thorough physical examination" of Plaintiff in August 2006. (R. 17). Specifically, Dr. Shah found Plaintiff to have some pain, lumbar spasm, and restriction of motion, but observed that he lacked many other signs of severe disc disease, such as localized muscle wasting or neurological abnormalities. In the ALJ's view, Dr. Shah's findings were supported by the May 2006 MRI, which showed "only moderate left and mild right neural foraminal narrowing" with no other evidence of disc herniation, protrusion or extrusion. (*Id.*). As for Plaintiff's complaints of disabling pain, the ALJ found them not entirely credible in light of all this medical evidence. (*Id.*).

The ALJ credited Dr. Jimenez's finding that Plaintiff was capable of light work, with a restriction on overhead lifting due to Plaintiff's shoulder problem, an assessment echoed by Dr. Kenney. (R. 19). As a result, the ALJ determined that Plaintiff could not perform any past relevant work, which required a medium level of exertion. (R. 20). The ALJ nonetheless found Plaintiff not disabled, accepting the VE's testimony that there were approximately 300,000 unskilled light jobs, and between 200,000 and 250,000 unskilled sedentary jobs in the Chicago area that Plaintiff could still perform. (R. 21).

## DISCUSSION

### A. Standard of Review

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review, in which case the district court reviews the decision of the ALJ. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, a "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### B. Definition of Disability

A claimant is entitled to disability benefits if he can establish that he is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). The Act defines "gainful employment" as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). A claimant must further show that the disability arose while he was insured for benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 802 (7th Cir. 2005).

The SSA uses a five-step sequential analysis to evaluate whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order:

> (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is capable of performing work in the national economy. Under the five-part sequential evaluation process, an affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter,* 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). That determination is made by assessing the claimant's age, education, work experience, and RFC "to see if [he] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).

12

**C.     Analysis**

In support of his claim for reversal, Plaintiff argues that the ALJ (1) erred in finding that his condition significantly improved after the June 2005 surgery, and (2) improperly weighed the medical opinions of record.  Plaintiff also objects that the ALJ's decision is not supported by substantial evidence.  The Court agrees with Plaintiff on the first two points, reverses the ALJ's denial of benefits, and remands the case for further proceedings consistent with this opinion.

**1.     Evidence of Medical Improvement**

Plaintiff claims that the ALJ erred in finding that he "experienced significant improvement following his lumbar surgery in June of 2005." (R. 17).  In making this determination, the ALJ relied extensively on the evaluation provided by Dr. Shah in August 2006.  Specifically, the ALJ stressed Dr. Shah's findings that Plaintiff had "no localized muscle wasting, atrophy, twitching, paralysis or involuntary movements," that his "[d]eep tendon reflexes, sensation and upper and lower extremity motor strength was normal," and that he could walk unaided. (R. 17, 19).  Plaintiff objects that the ALJ failed to mention Dr. Shah's additional findings that he (1) "could not sit for an extended period of time"; (2) "had much discomfort in his lower back, which is affecting his movements"; (3) had a positive "straight leg raising" test; and (4) had "severe low back pain with marked limitation of range of motion." (R. 365).  The ALJ did, however, acknowledge that Plaintiff continued to experience lumbar tenderness, spasms, and decreased range of motion.  He also discussed Dr. Jimenez's August 2007 assessment, confirmed by Dr. Kenney, that Plaintiff was capable of engaging in activities consistent with an RFC for light work. (R. 17, 18).

13

More problematic is the ALJ's one-sided account of Plaintiff's May 2006 MRI. According to the ALJ, the MRI revealed degenerative changes at L4-L5 and L5-S1, as well as central disc protrusion with moderate left and mild right neural foraminal narrowing at L4-L5, but "no other evidence of disc herniation, protrusion or extrusion." (R. 17). The same MRI, however, also showed the presence of granulation (scar) tissue, which the radiologist who performed the MRI concluded was "likely contributing to a right S1 radiculopathy." (R. 188).

Even more troubling is the fact that the ALJ barely mentioned Dr. Boscardin's medical findings regarding Plaintiff's condition after June 2005. Dr. Boscardin's treatment notes reflect that Plaintiff was "doing very well" after the surgery and was taking no pain medication aside from an occasional Motrin. (R. 173). According to Dr. Boscardin, Plaintiff nonetheless remained unable to work throughout August and September 2005, and the doctor "d[id] not know if he w[ould] ever be able to return back to full-duty." (R. 171-72). In December 2005, Plaintiff's pain returned along with a "markedly positive tension sign," and Dr. Boscardin prescribed five separate pain medications. (R. 169). By February 2006, Plaintiff showed marked improvement and was neurologically intact with only occasional back pain. Dr. Boscardin advised Plaintiff to establish an exercise program and work towards walking two to three miles a day. (R. 168). In May 2006, however, Plaintiff again presented with "a lot of low back problems," and Dr. Boscardin gave him Vicodin Extra Strength along with Lyrica. (R. 167). The following month, on June 16, 2006, Dr. Boscardin indicated that "we need to deal with this chronic nerve irritation." (R. 410). When Plaintiff next saw Dr. Boscardin in November 2006, he did not exhibit any radicular symptoms, but still complained of back pain and stiffness. (R. 409).

Aside from the February 2006 treatment note, the ALJ failed to discuss any of this evidence, leaving the Court unable to determine whether he properly considered it in rendering his decision. (R. 19). This is significant because Dr. Boscardin has treated Plaintiff since 1993 and performed all of his back surgeries. Under the "treating physician rule," an ALJ must give "controlling weight to the medical opinion of a treating physician or other source of medical treatment if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)). In this case, the ALJ provided almost no analysis of Dr. Boscardin's extensive treatment records, much less explained the weight, if any, that he gave to the doctor's assessments.

Contrary to Defendant's suggestion, the ALJ's assertion that "[n]o treating . . . physician of record described specific work-related restrictions that would prevent [Plaintiff] from performing a significant range of work activity," does not suffice to remedy this error. (R. 17). "Although a written evaluation of each piece of evidence . . . is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Defendant similarly cannot salvage the ALJ's conclusion by supplying his own, lengthy discussion of Dr. Boscardin's treatment records. (Doc. 20, at 3-5). An agency's lawyers cannot "defend the agency's decision on grounds that the agency itself had not embraced." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). On the facts presented, the Court cannot say that the ALJ's finding regarding Plaintiff's post-surgical improvement after June 2005 is supported by substantial evidence.

## 2. Improper Weighing of Medical Opinion Evidence

The parties agree that the ALJ did discuss – and dismiss – Dr. Boscardin's April 10, 2008 opinion that Plaintiff had continuing symptoms "compatible with chronic radiculopathy" and was unable to work due to this pain. (R. 562). In discounting this assessment, the ALJ first remarked that Dr. Boscardin's opinion was conclusory and concerned the ultimate issue of disability, which 20 C.F.R. § 1527(e)(2) specifically reserves for the Commissioner. (R. 19). The Seventh Circuit has held, however, that "[t]he opinion of an examining physician that the claimant is totally disabled, although phrased as an ultimate conclusion on the question presented to the [Commissioner], is entitled to consideration as an indication of how severe the patient's impairment was at the time of the examination." *Allen v. Weinberger*, 552 F.2d 781, 785 (7th Cir. 1977). Thus, the ALJ was not free to reject Dr. Boscardin's April 2008 opinion merely because he stated that Plaintiff was incapable of working.

Here, the ALJ went on to accept Dr. Jimenez's and Dr. Kenney's contrary findings that Plaintiff is capable of performing light work. This supports the ALJ's failure to give controlling weight to Dr. Boscardin's April 2008 opinion. At that point, however, the ALJ was required to determine what weight to give Dr. Boscardin's opinion, considering the following factors: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5). Failure to consider these factors in weighing a treating physician's opinion constitutes legal error and is grounds for reversal. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Aside from some boilerplate language regarding § 404.1527(d), there is no evidence that the ALJ considered any of the relevant factors in determining that Dr. Boscardin's opinion was unpersuasive. (R. 16). For example, the ALJ made no mention of the fact that Dr. Boscardin appears to be the only board-certified orthopaedic surgeon who evaluated Plaintiff. Dr. Shah, in contrast, is an internist, and the specialties of Dr. Jimenez and Dr. Kenney are not discernible from the record. Nor did the ALJ explain why the evaluation performed by Dr. Shah, who spent less than 45 minutes with Plaintiff, was more reliable than the opinions proffered by Dr. Boscardin, who has been treating Plaintiff since 1993, has performed all four of his back surgeries, and provided the most recent evaluation of his condition. (R. 362). As noted, the ALJ did not mention any of Dr. Boscardin's earlier treatment notes at all.

Defendant responds that these factors "do not necessarily outweigh the factors of supportability and consistency." (Doc. 20, at 8). Perhaps, but if properly considered, they "may have caused the ALJ to accord greater weight to [Dr. Boscardin's] opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). To the extent the ALJ's decision "does not explicitly address the checklist of factors as applied to the medical opinion evidence," it must be reversed for further analysis. *Id. See also Smith v. Commissioner of Social Sec.*, No. 2:09-CV-101-PRC, 2010 WL 1838366, at *10 (N.D. Ind. May 6, 2010) ("[T]he ALJ . . . did not consider the factors applied when a treating source's opinion is not given controlling weight" and, thus, "did not build an accurate and logical bridge nor did he give 'good reasons' for rejecting the opinion.")

### 3. Substantial Evidence

Plaintiff finally seeks reversal on the grounds that the ALJ's decision is not supported by substantial evidence. Plaintiff first notes that on a new application for benefits, the SSA reclassified his RFC as sedentary, and found him disabled less than two months after the ALJ's decision in the present case. As Defendant correctly notes, to the extent the later decision is evidence at all, it was not before the ALJ when he issued his opinion on September 3, 2008. Since the Appeals Council declined review, the ALJ's opinion is the final opinion of the SSA. Therefore, the SSA's decision on Plaintiff's later application is not admissible before this Court. *See Diaz v. Chater*, 55 F.3d 300, 305 n.1 (7th Cir. 1995). The emergence of new material evidence not before the ALJ can form the basis of a remand for rehearing under sentence six of 42 U.S.C. § 405(g), but Plaintiff does not seek that relief here.

Plaintiff also claims, without elaboration, that "[t]he medical evidence and testimony of record, when read in its entirety, overwhelmingly support a finding that Mr. Santoro is disabled." (Doc. 18, at 13; Doc. 21, at 4.) It is well-established that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). *See also Moss v. Astrue*, No. 09-1196, 2010 WL 2572040, at *5 (C.D. Ill. June 22, 2010). Plaintiff here is represented by counsel, and courts "are not in the business of formulating arguments for the parties." *United States v. Kirkland*, 567 F.3d 316, 322 (7th Cir. 2009). Other than as set forth above, Plaintiff's request for remand based on lack of substantial evidence is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for Summary Judgment [17] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: February 7, 2011

*Sheila Finnegan*
SHEILA FINNEGAN
United States Magistrate Judge